**FAR EASTERN TEXTILE, LTD., et al., Plaintiffs,**

v.

**CITY NATIONAL BANK AND TRUST COMPANY et al., Defendants.**

No. C-2-75-603.

United States District Court, S. D. Ohio, E. D.

April 20, 1977.

Alan Kay, Bregman, Abell, Solter & Kay, Washington, D.C., Robert Shamansky, Feibel, Feibel, Shamansky & Rogovin, Columbus, Ohio, for plaintiffs.

Bruce G. Lynn, Bricker, Evatt, Barton & Eckler, Columbus, Ohio, for defendant City Nat. Bank & Trust Co.

John D. Holschuh, Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, for defendants Nu-Look Fashions Menswear, Inc., Larry Fannin, and R. Paul Thomas.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the motion of defendant City National Bank and Trust Company [CNB] for summary judgment. The affidavit of one of CNB's officers as well as certain exhibits have been filed with the motion. Plaintiffs have submitted a memorandum in opposition but no accompanying affidavits, and CNB has replied to that memorandum. Plaintiffs' Washington D.C. counsel requested the opportunity to present oral argument on this motion, but that request was denied by order of this Court entered March 1, 1977.

CNB's motion turns on a very narrow issue of commercial law. One of the defendants in this case, Nu-Look Fashions Menswear, Inc., n/k/a Nu-Look Fashions, Inc. [Nu-Look], had entered into a contract with plaintiff Far Eastern Textile, Ltd. [Far Eastern] to purchase a quantity of men's clothing to be manufactured by Far Eastern. To facilitate this transaction, Nu-Look had at the same time caused CNB to issue a letter of credit in favor of Far Eastern for $339,192.00. Among the documents required by the terms of the letter of credit were an "Original Purchase Order Signed by Larry Fannin and Accepted by Seller," and an "Inspection Certificate Signed by Larry Fannin and Harry Le Beau." This letter of credit was amended twice, with the December amendment changing the terms of the inspection certificate requirement to read "Inspection Certificate may be Signed by either Larry Fannin, or Paul Thomas, or Harry Le Beau." Fannin and Thomas are the two individual defendants in this action. Fannin has been the president, and Thomas the national sales director, of Nu-Look during all times relevant to this proceeding.

In December 1973 Fannin and Thomas traveled to Taiwan to inspect the first one thousand pairs of trousers manufactured by Far Eastern. They found this sample unacceptable and rejected the goods. An accommodation was reached, however, and the initial purchase order rewritten. A subsequent trip was made in February 1974, this time without Fannin. There is some dispute over whether Thomas again found plaintiff's product unsatisfactory, and con-

sented to a partial shipment on the representation that improvements would be made, or whether he approved the product and an initial shipment of 384 pairs of pants. In any event, plaintiff shipped 384 pairs of pants to Nu-Look.

On Far Eastern's behalf, the corresponding documents of title were presented to CNB for payment against the outstanding letter of credit. CNB, however, discovered "certain discrepancies" and refused to honor the draft until requisite assurances could be obtained from Fannin. Permission was obtained and, on March 22, 1974, the draft was paid. One of these discrepancies was an original purchase order signed "Larry Fannin by Paul Thomas" rather than simply "Larry Fannin." Plaintiffs, however, vigorously assert that this particular discrepancy did not contribute to CNB's decision to seek assurances.

Meanwhile, on March 10, 1974, Far Eastern had shipped nearly 4000 dozen pairs of men's pants to Nu-Look. The draft against the letter of credit was presented for payment on March 19, 1974, and on March 20 CNB discovered two discrepancies in the documents. One of these, as before, was that the purchase order had been signed "Larry Fannin by Paul Thomas" rather than simply "Larry Fannin." CNB again sought permission to pay, but this time such permission was refused.

Far Eastern has made CNB a defendant in this action primarily on the basis of its failure to pay in accordance with the terms of its irrevocable letter of credit. Other claims have been made that CNB perpetrated fraud and participated in a scheme to defraud Far Eastern and the International Commercial Bank of China. It appears from the complaint that the only possible participation of CNB in the alleged fraud lay in its refusal to pay according to the terms of its letter of credit (this is the only particular which is specifically alleged in plaintiff's complaint, as required by Rule 9(b), Federal Rules of Civil Procedure). That allegation will be briefly considered following the Court's analysis of the main claim. Thus, the narrow issue presently

before this Court for resolution is whether an agent's signature on behalf of his principal may constitute a signature of the principal, when that is required by the terms of a letter of credit.

■ Preliminarily, it is necessary to indicate certain factors which must govern this Court's decision and boundaries which must be placed on its application. As all parties to this litigation recognize, a letter of credit transaction usually comprises three contracts: the contract between the issuing bank and its customer, the contract between the bank's customer and the beneficiary of the letter of credit, and the contract between the issuing bank and the beneficiary. The contract between the bank and the beneficiary, which is the letter of credit itself, is entirely independent of the other two contracts. As a result, defenses which might be available in actions brought under the main contracts are often not available to a party breaching a bank-beneficiary letter of credit agreement. See *Venizelos, S. A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir. 1970). That agreement is determined solely by the letter of credit itself. If the beneficiary's demand for payment conforms to the terms of the letter, then the issuer is obligated to pay irrespective of any nonconformity in goods shipped and irrespective of most defenses which the bank's customer can separately raise against the beneficiary. Ohio Rev.Code § 1305.13 (Page 1962). *See also Sisalcords do Brazil, Ltd. v. Fiacao Brasileira de Sisal, S. A.*, 450 F.2d 419, 422 (5th Cir. 1971), *cert. denied*, 406 U.S. 919, 92 S.Ct. 1771, 32 L.Ed.2d 118 (1972). On the present motion then, this Court is concerned strictly with CNB's nonconforming signature defense. A decision in CNB's favor would mean that CNB was not obligated under the letter of credit to pay upon presentment of the draft by the International Commercial Bank of China. It would not affect the liability, if any, of the other defendants in this action. Any question involving the underlying agreement, including the alleged fraudulent signature of Harry LeBeau on the inspection certificate,

is not relevant and has not been considered by the Court.

■ This Court of course recognizes that in ruling on a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The Court will assume, for the purposes of this motion only, that Thomas had the authority to act as Fannin's agent and that his authority was known to CNB. The Court will further assume that CNB did not have the signature discrepancy in mind when it contacted Fannin for permission to pay the first draft.

In deciding this motion, the Court finds itself forced to navigate between the Scylla of overly strict construction of letters of credit and the concomitant stranglehold which that could place on international commerce, and the Charybdis of loose construction with the accompanying loss of protection to the party obtaining the letter of credit. The course is largely uncharted. The Uniform Commercial Code failed to specify "whether strict compliance [with the terms of the letter] is necessary or whether 'substantial performance' will do," although it "should have" done so. *J. White & R. Summers, Uniform Commercial Code* § 18–6 at 620 (1972). Pre-Code law sheds little additional light. Due in large part to regulation by the banks themselves, "there has been astonishingly little litigation on the subject of letters of credit." *Mead Corp. v. Farmers and Citizens Bank,* 14 Ohio Misc. 163, 232 N.E.2d 431, 433 (C.P. 1967).

New York, which supplies most of the case law in this area, would apply a bifurcated standard. It would require strict compliance with the terms of the letter when the bank is being sued by the beneficiary for refusing to honor drafts on presentment. On the other hand, it would apply a substantial compliance test when the bank is being sued by the customer for wrongful payment. *See, e. g., Marine Midland Grace Trust Co. v. Banco Del Paris, S. A.,* 261 F.Supp. 884, 889 (S.D.N.Y.1966); *White & Summers, supra,* at 622.[1]

■ The logic behind this treatment is persuasive. The bank's function in the letter of credit transaction, dictated by the requirements of international commerce, is basically ministerial. It guarantees the availability of funds for payment and makes payment upon the satisfaction of specified conditions. It is not expected to become embroiled in any underlying disputes between the principals to the transaction, and to this end may not normally assert any defenses which would be available to one of the principals. It follows that an issuer should not be expected to second-guess the propriety, validity, or conformity of the necessary documents. Free and unobstructed commercial transactions would suffer if banks felt themselves constrained to obtain some form of prior decision in order to protect against future lawsuits. Accordingly, it seems reasonable to hold the beneficiary to a standard of strict compliance when it is seeking to hold the bank accountable for failing to honor a draft. Anything short of this standard would force a bank confronted with a discrepancy to resolve the preliminary question of whether the discrepancy was substantial enough to support its decision to

---

1. *Venizelos, S. A. v. Chase Manhattan Bank, supra,* which plaintiffs have cited for the proposition that a "construction that will sustain an instrument will be preferred to one that will defeat it" is distinguishable. It involved an attempt by the issuer to justify its dishonor by reference to an inherent ambiguity in the documents. Since one interpretation would have made the contract incapable of performance in the manner foreseen, and another would have conformed to what the facts suggest was the

parties' intent, the latter interpretation was adopted and the above principle cited as authority. There is no suggestion here, however, that the contract would have been incapable of performance had Fannin's signature been required. It might also be pointed out that the *Venizelos* court cites with approval *Marine Midland Grace Trust Co. v. Banco Del Paris, S. A., supra,* for the proposition that the requirements of a letter of credit must be strictly complied with.

dishonor. Such a decisionmaking function is, of course, inconsistent with the ministerial nature of the bank's duty. On the other hand, it is logical to give the bank the benefit of a substantial compliance standard in wrongful payment actions brought by the customer. The customer, after all, was the party which supplied the requirements to the bank, so that any ambiguities should be resolved most strongly against him. Just as the function of a letter of credit would be defeated if banks were constrained by an expansive interpretation of a beneficiary's rights, so also would it be defeated by inhibiting the bank's ability to perform its duty in good faith.

It does not seem that Ohio courts would disagree with this reasoning. The first reported case which purports to set standards for the duty owed by an issuer of something akin to a letter of credit likened the letter to a guaranty agreement and held that its maker can be held only to the strict terms of the obligation. *Palmer v. Yarrington,* 1 Ohio St. 253, 260 (1853). This rule was reiterated in *Mead Corp., supra,* which also cited with approval the New York rule. 232 N.E.2d at 434. Such a rule might also be inferred from the (admittedly pre-*Erie*) decision of the Sixth Circuit in *Lamborn v. Cleveland Trust Co.,* 29 F.2d 46 (6th Cir. 1928), in which the issuer was held estopped to assert a technical nonconformity defense because it had failed to raise it at an earlier opportunity. The defense was one which would have been available under a strict conformity standard but not under a substantial compliance standard. Arguably the court would not have had to reach the estoppel question had it not implicitly found the nonconformity defense a viable one.

■ Accordingly, this Court concludes that an Ohio court confronted with this question would adopt the New York rule. In the present circumstances, CNB had failed to honor Far Eastern's draft when presented. Far Eastern, as a beneficiary, is therefore held to a strict standard of compliance with the terms of the letter of credit. The letter of credit specifically required an "original purchase order signed by Larry

Fannin and accepted by seller." Since this condition is not met, it follows that CNB was not required to honor the draft upon presentment.

■ Certain of plaintiffs' arguments bear further elaboration, however. The strongest argument they raise is that Thomas, as Fannin's agent, had the legal authority to enter into a binding purchase agreement with Far Eastern. From the nature of Thomas' deposition, portions of which have been included with plaintiffs' memorandum in opposition, it does not appear that his agency can be seriously questioned. Nor would this Court be surprised if it developed at trial that CNB was aware of Thomas' position and authority at Nu-Look. Indeed, Fannin had instructed CNB only a few days previously to pay on a nonconforming draft which contained the same signature discrepancy. But the problem is that the plaintiffs are confusing Thomas' agency powers under general contract law with his powers under the commercial law governing letters of credit. In light of the strict compliance standard which this court just adopted, the powers of an agent in a letter of credit transaction must be much more restricted. Where the beneficiary is charging the bank with wrongful dishonor on the basis of documents which would be conforming only if an agency relationship were recognized, that agency must arise from the letter of credit itself. This Court does not reach the question of how this rule might be altered by an established course of dealing between all of the parties or a particular usage of trade.

As the two amendments to the initial agreement demonstrate, this is not an impossible rule to live with. If commercial exigencies dictate cloaking a subordinate with agency authority, the letter can be appropriately amended. A rule which states that requirement clearly is to this Court preferable to one which would require the circumstances of each case to be resolved individually by a court.

Moreover, permitting evidence supporting an agency relationship to be introduced

under these circumstances subverts the independent nature of the contract between the beneficiary and the issuer. This Court perceives little difference between amending otherwise unambiguous terms of a letter of credit through the introduction of evidence relating to an alleged agency relationship and amending such terms through evidence of an implied agreement between buyer and seller respecting one of the necessary documents. Both risk embroiling the bank in disputes between the bank's customer and the credit beneficiary, which letters of credit are intended to avoid. *See Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802, 805 (4th Cir. 1975); *Venizelos, supra*, 425 F.2d at 465.

Plaintiffs have also raised the question of estoppel, submitting that they "relied" on CNB's action in honoring the first draft and that this reliance was to their detriment. Plaintiffs' own memorandum indicates that their argument here is a makeweight and hardly worthy of consideration by this Court. This Court is at a loss to understand how there is any detrimental reliance incurred when the last act constituting the reliance (the submission of the second draft for payment) occurred on March 20, 1974, two days *before* the payment on which the alleged reliance is based. Moreover, a strong argument could be made that the last act constituting the reliance was shipping the goods covered by the second purchase order, since there was no act which plaintiffs could unilaterally have taken after this point to mitigate their damages. This occurred on March 12, a full week before the first draft was even presented to CNB for payment.

Accordingly, this Court finds that CNB was justified in refusing to pay the second draft presented under the letter of credit. Since the only representation made by CNB on which plaintiffs' allegations of fraud could be based was that it would pay on demand upon presentation of the requisite documents, it follows that CNB cannot, as a matter of law, be held to have acted fraudulently in failing to pay absent conforming documents. Plaintiffs' counts alleging fraud against CNB must be dismissed as well.

Plaintiffs have also alleged that CNB conspired with the other defendants to commit fraud. Viewing all questions of fact in the light most favorable to the plaintiffs, this Court is unable to see how it could possibly find for the plaintiffs against CNB. There is nothing improper about the requirements of the letter of credit, and CNB has averred, by its officer John Laird, that payment would have been made had there been no discrepancies. Even if CNB had wished to enter into a conspiracy to commit fraud, there is no way it could have furthered such a conspiracy on these facts. Accordingly, the count alleging participation in a conspiracy to defraud must be dismissed as to CNB.

WHEREUPON, this Court finds that the motion of CNB for summary judgment is meritorious and it is accordingly GRANTED.